# IN THE SUPREME COURT OF TEXAS

════════════

No. 13-0337

════════════

PLAINSCAPITAL BANK, PETITIONER,

v.

WILLIAM MARTIN, RESPONDENT

══════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

══════════════════════════════════════════════════

**Argued September 18, 2014**

JUSTICE JOHNSON delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE WILLETT, JUSTICE LEHRMANN, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE GUZMAN joined.

After William Martin defaulted on a note, PlainsCapital Bank foreclosed its contractual deed of trust lien on property securing the note. The bank was the highest bidder at the foreclosure sale and bought the property for less than the secured debt. Martin sued the bank, asserting, in part, that the property's fair market value on the date of foreclosure was in excess of the foreclosure sales price and Texas Property Code § 51.003 required the bank to offset the excess against his debt. The trial court determined that § 51.003 did not apply and rendered judgment for the bank on its counterclaim for damages and attorney's fees. The court of appeals reversed and remanded to the trial court. It

held that (1) § 51.003 applied, (2) the term "fair market value" as used in § 51.003 is the historical willing-seller/willing-buyer definition of fair market value, and (3) although legally insufficient evidence supported the trial court's findings as to the Bank's damages, Martin did not conclusively prove his affirmative defense, leaving a factual question unsettled. The appeals court remanded the case to the trial court for further proceedings.

We agree with the court of appeals that § 51.003 applies, but disagree that the term "fair market value" as used in that section equates to the historical willing-seller/willing-buyer construct. We reverse the judgment of the court of appeals and remand the case to that court for further proceedings in accordance with this opinion.

## I. Background

William Martin borrowed money from PlainsCapital Bank in September 2006 pursuant to a construction loan agreement and promissory note. He borrowed the money to build a house that he intended to sell and secured his obligations to the bank by executing a deed of trust on the lot and improvements to it (the property). After Martin built the house, he was unable to sell it and in March 2008 defaulted on his note, prompting PlainsCapital to begin foreclosure proceedings. The bank consulted a real estate broker who estimated the property's fair market value as $770,000, with the broker also noting that the local real estate market was depressed and houses in the area were normally taking 273 days to sell. Based on its past experience, PlainsCapital estimated that its costs to hold and dispose of the property would be thirty percent of the property's value, or $231,000.

The foreclosure sale was held on June 3, 2008. Martin does not contest the amount that the bank says he owed on that date, which was $770,757.45 in principal, $15,791.02 in interest, and

2

$2,705.52 in attorney's fees for the foreclosure. PlainsCapital purchased the property for its bid of $539,000—the difference between the broker's estimate of the property's value and the bank's estimated holding and disposition costs of $231,000. A week after purchasing the property, PlainsCapital had it appraised. The appraiser estimated the fair market value of the property as $825,000 and opined that the value would have been the same during the preceding week when the foreclosure sale took place.

Although PlainsCapital promptly marketed the property, it did not sell. A re-appraisal in July 2009 valued the property at $575,000 and noted a general decline in property values from the preceding year. PlainsCapital finally sold the property in September 2009 for $599,000.

Shortly after the foreclosure sale Martin sued PlainsCapital on various theories, including fraud and wrongful foreclosure. The bank counterclaimed for damages from Martin's breach of the construction loan agreement, note, and deed of trust, and also for attorney's fees. Martin subsequently dismissed his affirmative claims, but maintained that Property Code § 51.003 required an offset of the property's fair market value on the date of the foreclosure sale against any judgment in favor of PlainsCapital. He alleged that the fair market value was $825,000. The case was tried to the court in January 2010, several months after PlainsCapital sold the property.

The trial court first considered whether Texas Property Code § 51.003 applied. Section 51.003 provides as follows:

(a) If the price at which real property is sold at a foreclosure sale under Section 51.002 [Sale of Real Property Under Contract Lien] is less than the unpaid balance of the indebtedness secured by the real property, resulting in a deficiency, any action brought to recover the deficiency must be brought within two years of the foreclosure sale and is governed by this section.

(b) Any person against whom such a recovery is sought by motion may request that the court in which the action is pending determine the fair market value of the real property as of the date of the foreclosure sale. The fair market value shall be determined by the finder of fact after the introduction by the parties of competent evidence of the value. Competent evidence of value may include, but is not limited to, the following: (1) expert opinion testimony; (2) comparable sales; (3) anticipated marketing time and holding costs; (4) cost of sale; and (5) the necessity and amount of any discount to be applied to the future sales price or the cashflow generated by the property to arrive at a current fair market value.

(c) If the court determines that the fair market value is greater than the sale price of the real property at the foreclosure sale, the persons against whom recovery of the deficiency is sought are entitled to an offset against the deficiency in the amount by which the fair market value, less the amount of any claim, indebtedness, or obligation of any kind that is secured by a lien or encumbrance on the real property that was not extinguished by the foreclosure, exceeds the sale price. If no party requests the determination of fair market value or if such a request is made and no competent evidence of fair market value is introduced, the sale price at the foreclosure sale shall be used to compute the deficiency.

TEX. PROP. CODE § 51.003.

PlainsCapital argued that the language of § 51.003(a) limits § 51.003's application to cases in which "the" deficiency sought from the borrower is the precise difference between the foreclosure sale price and the outstanding secured obligations. That being so, the Bank reasoned, the statute is inapplicable to its claim against Martin because the bank was not seeking a deficiency based on "the" foreclosure sale price; rather, it was seeking a deficiency based on the price for which it subsequently sold the property.

Siding with PlainsCapital, the trial court held that § 51.003 did not apply. It held a hearing, made and entered findings of fact and conclusions of law, and rendered judgment for the bank for $332,927.27 in damages—including holding costs and costs of sale damages per the construction loan agreement and deed of trust—and $127,558.24 in post-foreclosure attorney's fees.

4

Additionally, however, the trial court concluded that even if § 51.003 applied, Martin would not be entitled to an offset because the fair market value under § 51.003(b) was less than the $539,000 that PlainsCapital paid at the foreclosure sale. In its findings of fact underlying that conclusion, the trial court began with the $599,000 "future price of the property" for which the bank subsequently sold it. *See* TEX. PROP. CODE § 51.003(b)(5). From that amount, the court subtracted the bank's actual holding costs and costs of sale, which it found were $75,376.41 and $45,907.94, respectively, and which it concluded § 51.003(b)(3) and (4) authorized it to deduct.

The court of appeals reversed. *Martin v. PlainsCapital Bank*, 402 S.W.3d 805, 811-12 (Tex. App.—Dallas 2013). It held that Martin's deficiency must be calculated pursuant to § 51.003, and agreed with other courts of appeals[1] that the term "fair market value" as used in § 51.003 was intended by the Legislature to have the "historical" definition: the price the property would bring when offered for sale by a seller desiring to sell, but not obliged to do so, and bought by a purchaser desiring to buy, but under no necessity of doing so. *Id.* The court further held that the evidence was legally insufficient to support the finding of $332,927.27 in damages to the bank because the trial court used the actual 2009 resale price of $599,000 to calculate the bank's damages, even though there was no evidence to support linking that amount to the fair market value on the date of the foreclosure sale. *Id.* at 813. The court remanded the case for the trial court to determine the factual issues the appeals court identified, including the property's fair market value on the date of the

---

[1] *Cabot Capital Corp. v. USDR, Inc.*, 346 S.W.3d 634, 639 (Tex. App.—El Paso 2009, pet. denied) (applying historical definition in § 51.003 suit) (citing *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex. 1972)); *Preston Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 658 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981)).

5

foreclosure sale. *Id.* The court did not reach the merits of Martin's challenges to the trial court's awarding post-foreclosure holding costs and costs of sale, or attorney's fees. Those parts of the judgment were reversed and remanded along with the rest of the case. *Id.* at 813-14.

As relevant to our analysis, PlainsCapital advances multiple reasons for which it says the court of appeals' judgment should be reversed: (1) § 51.003 is not applicable because it only applies when a deficiency is based on the foreclosure sale price, and the bank did not base its damages claim on that price; (2) even if § 51.003 applies, fair market value under the statute is not the same as the historic definition of fair market value; (3) sufficient evidence supports the trial court's finding as to the property's § 51.003 fair market value on the date of the foreclosure sale; and (4) the trial court properly awarded PlainsCapital its post-foreclosure costs and attorney's fees.[2]

Martin responds: (1) § 51.003 governs all nonjudicial foreclosure deficiency calculations where the lien is contractually created, as it was here; (2) although the statute provides guidance as to what is competent evidence of fair market value, the court of appeals correctly held that the historic willing-seller/willing-buyer definition of fair market value applies under § 51.003(b); (3) the statute requires that a property's fair market value be determined as of the date of the foreclosure sale, and because the trial court based its calculations of that value on the price for which PlainsCapital later sold the property and the bank's actual expenses, no evidence supported the trial court's finding of value; (4) PlainsCapital is not entitled to post-foreclosure holding and sales costs because Martin no longer retained any interest in the property and he should not be held liable for

---

[2] The Independent Bankers Association of Texas, Texas Bankers Association, and Texas Mortgage Bankers Association submitted an amicus curiae brief in support of PlainsCapital.

those costs; and (5) if § 51.003 does not apply and PlainsCapital's post-foreclosure holding and sales costs can be considered in determining a property's fair market value, then the case should be remanded for the court of appeals to consider Martin's challenges to the factual sufficiency of the evidence as to those costs.

## II. Discussion

The issues before us essentially are two: (1) whether § 51.003 applies, and if so, (2) whether it contemplates the use of a post-foreclosure sale price and actual post-foreclosure costs as competent evidence of fair market value. We begin our analysis by considering whether § 51.003 applies.

## A. Section 51.003

Section 51.003, enacted in 1991, adds balance to the mortgagor-mortgagee relationship regarding deficiency judgments. It does so by circumscribing mortgagees' rights to seek deficiency judgments and specifying rights that borrowers[3] have regarding alleged deficiencies. TEX. PROP. CODE § 51.003. Section 51.003 substantively provides that when realty is foreclosed on pursuant to a contract lien and the foreclosure sales price is less than the debt secured, a suit brought against the borrower for "the unpaid balance of the indebtedness secured by the real property" is a suit for a deficiency judgment. *Id.* § 51.003(a). The borrower in such a suit may request that the trial court make a finding as to the fair market value of the realty as of the date of the foreclosure sale. *Id.* § 51.003(b). If the trial court finds the fair market value to be in excess of the foreclosure sales price, then the borrower is entitled to an offset against the deficiency in the amount of the excess

---

[3] Section 51.003 refers to "[a]ny person against whom such a [deficiency] recovery is sought." TEX. PROP. CODE § 51.003(b). For ease of reference we primarily refer to such a person as a "borrower." We do not intend by the use of that term to imply a limitation on § 51.003 that is not included in its language.

(less the amount of any obligations secured by a lien on the property but not extinguished by the foreclosure). *Id.* § 51.003(c).

PlainsCapital parses the language of § 51.003(a) and argues that the Legislature's use of the word "the" when referencing deficiency as opposed to "a" deficiency or "any" deficiency limits the application of § 51.003 to deficiencies calculated using the precise foreclosure sales price. *See id.* § 51.003(a) ("any action brought to recover *the* deficiency must be brought within two years of the foreclosure sale and is governed by this section.") (emphasis added). The Bank reasons that use of "the" in the statute makes the section inapplicable to situations such as this where deficiencies are calculated using amounts that vary to some degree from the foreclosure sales price. We disagree.

Read as a whole and in context with the remainder of § 51.003, § 51.003(a) provides that whenever a borrower is sued after real property is sold at a foreclosure sale as permitted by and described in § 51.002, and judgment is sought against the borrower because the foreclosure sales price is less than the amount owed, then (1) the suit is for a "deficiency judgment," (2) the suit must be brought within two years of the foreclosure sale, and (3) the suit is governed by § 51.003. But how the amount of the deficiency is calculated is not prescribed by § 51.003(a); rather it is prescribed by § 51.003(b) and (c). Section 51.003(b) affords a borrower the right to request the trial court to determine the fair market value of the property and sets forth how such is to be calculated. Section 51.003(c) prescribes how the amount of the deficiency judgment is to be determined. Under § 51.003(c), if the trial court is not requested to determine the property's fair market value, or if such a request is made but no competent evidence of fair market value is presented, then the foreclosure sales price must be used to calculate the deficiency for purposes of a judgment.

8

PlainsCapital's proposed interpretation requires reading one word—"the"—out of context from the remainder of § 51.003. It would allow lenders to bypass the carefully crafted deficiency judgment statute with its two-year limitations period and other protections for borrowers and creditors by simply suing the borrower for some amount other than the difference between the amount of the secured debt and the exact foreclosure sales price. The word "the" in the statute referencing a deficiency cannot bear the burden the bank seeks to place on it. PlainsCapital's claim against Martin falls within the provisions of § 51.003 and the court of appeals did not err by so holding.

## B. Section 51.003 Fair Market Value

PlainsCapital contends that even if § 51.003 applies to its claim, the court of appeals erred because it equated "fair market value" as that term is used in § 51.003 with the historic measure of fair market value, which is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). That error, PlainsCapital asserts, led the appeals court to erroneously reverse the trial court's judgment. Martin responds that the court of appeals was correct in its interpretation of the statute.

When a statute uses a word or phrase without defining it, we presume the Legislature intended the common meaning of the word or phrase to apply. *See City of Houston v. Bates*, 406 S.W.3d 539, 544 (Tex. 2013). And when a statute provides a definition for or uses a word or phrase in a particular manner, then courts must apply that definition or manner of use when interpreting the statute. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). Similarly,

9

we presume the words in a statute are selected with care and we interpret them in a manner that gives meaning to all of them without disregarding some as surplusage. *See id.*; *State v. Shumake*, 199 S.W.3d 279, 287 (Tex. 2006).

The Legislature used the phrase "fair market value" in § 51.003 without defining it, so we would ordinarily presume the common meaning of the term applies, as did the court of appeals. However, the statute enumerates categories of evidence and clearly specifies that they may be considered by trial courts in determining fair market value. TEX. PROP. CODE § 51.003(b). For example, § 51.003(b)(5) specifies that a trial court, when calculating the fair market value as of the date of the foreclosure sale, may consider evidence of "the necessity and amount of any discount to be applied to the future sales price." This factor is forward looking, allowing the trial court to consider the price for which the lender eventually sells the property and to apply a discount, if appropriate, to determine a value as of the foreclosure sale date. It may seem odd to make the price for which the property sold *after* foreclosure an integral component of competent evidence of the property's fair market value on the foreclosure sale date, but that is clearly what the Legislature intended. If it were not, then the relevant part of § 51.003(b)(5) would be nonsensical because an unknown fair market value, which is the value being sought, cannot mathematically be determined by applying a discount to an unknown future sales price, nor could either a prospective buyer or the seller know what the future sales price will be in order to factor it into their decision to buy or sell, regardless of whether a discount factor is applied. And we do not attribute to the Legislature an intent to enact nonsensical statutes. *See* TEX. GOV'T CODE § 311.021(3) ("In enacting a statute, it is presumed that . . . a just and reasonable result is intended . . . ."); *Hernandez v. Ebrom*, 289

S.W.3d 316, 321 (Tex. 2009). Further, if we were to rule the future sales price competent evidence, but only upon a showing of comparable market conditions between the foreclosure sale and the future sale, we would be adding words to § 51.003. We refuse to do that in the absence of clear legislative intent to reach a different result from that reached by applying the plain language of the statute, or to prevent the statute from yielding an absurd or nonsensical result. *See Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001).

Therefore, the enumerated factors in § 51.003(b) will support a fair market value finding under the statute even though that type of evidence might not otherwise be competent in the common or historical fair market value construct. That being so, the term "fair market value" in § 51.003 does not equate precisely to the common, or historical, definition. Rather, it means the historical definition as modified by evidence § 51.003(b) authorizes the trial court to consider in its discretion, to the extent such evidence is not subsumed in the historical definition.

Which leads to the next issue: did the trial court err in its finding as to the § 51.003 fair market value of the property on the date of the foreclosure sale? The court of appeals held that it did. We disagree.

### C. The § 51.003 Fair Market Value Finding

An offset under § 51.003 operates as an affirmative defense to a deficiency claim. *See Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 6 (Tex. 2014) ("[Section 51.003] provides an offset that otherwise would not be available. In other words, it provides a defense."). Borrowers are entitled to an offset only if they request, prove, and obtain a finding of the property's § 51.003 fair market value as of the date of the foreclosure sale and that value exceeds the foreclosure sales

11

price. TEX. PROP. CODE § 51.003(b), (c). Consequently, in order to receive an offset, Martin bore the burden of proving and obtaining a § 51.003 fair market value finding as of June 3, 2008, that exceeded the $539,000 foreclosure sale price. He contended in the court of appeals, and contends here, both that no evidence supports the trial court's finding of $477,715.65 as the property's § 51.003 fair market value on that date, and that to the contrary, the evidence conclusively establishes the fair market value on that date was $825,000—an amount in excess of his debt. Because the trial court found against him and he had the burden of proof, to prevail on both his contentions on appeal he must show first, that no evidence supported the trial court's finding, and if there was none, then second, that the evidence conclusively established the property's value was what he alleges—$825,000. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

The court of appeals held that no evidence linked the actual price for which PlainsCapital sold the property—$599,000—to the property's fair market value on the foreclosure sale date, so the trial court's calculations of the § 51.003 fair market value for purposes of determining whether § 51.003 applied and the bank's damages were erroneous. *Martin*, 402 S.W.3d at 813. The court based its determination on its conclusion that the meaning of fair market value in § 51.003 is its historic definition, which we have explained was error. Because the court of appeals determined that the future sales price was not competent evidence under the statute and remanded, it did not address the factual sufficiency challenges Martin raised as to the trial court's § 51.003 fair market value determination. Nor did it conduct either a legal or factual sufficiency review of the trial court's findings of the bank's holding and sale costs.

Although the trial court determined that § 51.003 did not apply, it made findings of fact in the event it did. Those findings included the property's § 51.003 fair market value as of the foreclosure sale date as being $477,715.65. It then concluded that § 51.003 did not entitle Martin to an offset because the fair market value was less than the foreclosure sales price of $539,000. The trial court based its fair market value findings on the property's future sales price of $599,000, which § 51.003(b) authorized it to consider. Further, although § 51.003(b) permitted, but did not require the trial court to do so, it neither applied a discount to the $599,000 sale price, nor deducted the $231,000 that PlainsCapital estimated for holding and sale costs and that led to its bid of $539,000 at the foreclosure sale. Rather, the court subtracted from the sales price the amounts it found to be the bank's actual holding costs and costs of sale. And § 51.003(b) specifies that these may be considered. TEX. PROP. CODE § 51.003(b)(3), (4) ("Competent evidence of value *may* include, *but is not limited to*" anticipated holding costs and costs of sale) (emphasis added). The trial court excluded PlainsCapital's evidence of a discount rate to be applied to the actual sales price, but the bank complains neither of that ruling nor the trial court's failure to apply a discount to the $599,000 sales price, which the statute would have allowed if competent evidence of such discount had been shown. Nor does PlainsCapital complain of the trial court's failing to use the bank's estimated holding and sale costs of $231,000 in calculating the § 51.003 fair market value. Had the trial court done either, the result would have been a lesser number for the § 51.003 fair market value finding than the $477,715.65 figure the trial court found, and Martin still would not have been entitled to

13

an offset.[4]   Because the statue both authorizes unknown but anticipated holding costs to be considered as competent evidence and specifies that the trial court may consider but is not limited to considering the listed categories of evidence, we see no reason that the trial court could not, in its discretion, have considered actual holding costs. *See id.* § 51.003(b).

In a single sentence, without challenging any particular expense item or citing authority, Martin contends that the evidence is not legally sufficient to support the trial court's actual holding and sale costs findings because no evidence showed the costs were reasonable and necessary. We disagree.

In regard to the costs, Doug Cook, President of the North Dallas branch of PlainsCapital, testified as to the bank's holding costs and costs of sale. Cook relied on bank business records that listed in itemized detail the holding costs paid by PlainsCapital. He testified that the expenses totaled $75,376.41, and included maintenance items such as utilities, homeowner-association fees, insurance, and $14,136.15 in property taxes. As to sales costs, Cook testified that the bank spent $45,907.04 on real estate commissions and closing costs. We conclude that the trial court did not abuse its discretion by calculating the property's fair market value using the $599,000 future sales price, not applying a discount to reduce the price further, and deducting PlainsCapital's actual holding costs of $75,376.41 and actual sales costs of $45,907.04. *See* TEX. PROP. CODE § 51.003(b) ("Competent evidence of value may include but is not limited to the following. . . ."). Further, the

---

[4] For example, the actual holding costs the trial court found and used—$75,376.41—together with the actual costs of sale it found and used—$45,907.94—totaled over $110,000 less than the bank's anticipated holding and sales costs of $231,000.

14

evidence was legally sufficient to support the trial court's finding that the fair market value of the property on the date of the foreclosure sale for § 51.003 purposes was $477,715.65.

## D. PlainsCapital's Damages

The trial court found PlainsCapital was damaged in the amount of $332,927.27. It based its finding in part on the actual holding and sale costs incurred by PlainsCapital, and by giving credit to Martin for the $599,000 amount for which the bank sold the property in 2009. The court of appeals reversed that finding and remanded the case to the trial court for determination of the property's fair market value on the foreclosure sale date and for factual findings in support of, among others, the property's fair market value. Those issues should be reconsidered by the court of appeals in light of our holding as to the trial court's discretion to use the future sales price for purposes of § 51.003 fair market value, and in light of Martin's factual sufficiency challenges to the bank's holding and sales costs following the foreclosure sale.

## III. Disposition

PlainsCapital urges that Martin neither properly preserved error in the trial court nor properly briefed and urged issues in the court of appeals as to the factual sufficiency of the evidence to support the trial court findings regarding the bank's holding and sale costs. Martin responds that he did. He prays that in the event we hold the trial court did not err by using the actual holding costs and costs of sale, and that legally sufficient evidence supports its findings as to those costs, then we remand the case to the court of appeals for it to consider his factual sufficiency challenges and other issues that the appeals court did not consider.

15

We agree with Martin that his factual sufficiency challenges should be remanded to the court of appeals. PlainsCapital may urge its preservation and briefing arguments there.

Because the court of appeals did not consider the merits of Martin's challenges to the trial court's award of attorney's fees to PlainsCapital, we remand that issue to the court of appeals for it to consider in light of its resolution of the other issues being remanded.

The judgment of the court of appeals is reversed. The case is remanded to that court for further proceedings in accordance with this opinion.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** March 27, 2015